<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE,<br><br>Plaintiff,<br><br>v.<br><br>DALE G. CALDWELL, *in his official capacity as Secretary of State of New Jersey*,<br><br>Defendant. | Civil Action No. 25-17612 (GC) (JTQ)<br><br><u>**MEMORANDUM OPINION**</u> |

<u>**CASTNER, District Judge**</u>

**THIS MATTER** comes before the Court upon Defendant Dale G. Caldwell's Motion to Dismiss Plaintiff Republican National Committee (RNC)'s Complaint (ECF No. 1) under Federal Rules of Civil Procedure (Rules) 12(b)(1) and 12(b)(6).  (ECF No. 17.)  Plaintiff opposed, and Defendant replied.  (ECF Nos. 23, 24.)  The Court has carefully reviewed the parties' submissions and decides the matter without oral argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, and other good cause shown, Defendant's Motion is **GRANTED** for Plaintiff's lack of standing to pursue its claim.

I.      <u>**BACKGROUND**</u>

   A.      **Factual Background**[1]

   Plaintiff is the national organization of the Republican Party, with its principal place of business in Washington, DC.  (ECF No. 1 ¶ 4 (citing 52 U.S.C. § 30101(14).)  Plaintiff manages

---

[1]      On a motion to dismiss under Rule 12(b)(6), the Court must accept all facts as true, but courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation modified).

the Republican Party's business at the national level, supports Republican candidates for public office at all levels, including in New Jersey, coordinates fundraising and election strategy, and develops and promotes the national Republican platform. (*Id.*) Defendant is the Secretary of State of New Jersey and oversees New Jersey's Division of Elections. (*Id.* ¶ 5.)[2] This matter concerns whether Defendant is obligated to disclose certain voter information to Plaintiff pursuant to the National Voter Registration Act (NVRA), 52 U.S.C. § 20507.

Plaintiff purchases New Jersey voter registration rolls and alleges it relies on those rolls to "identify eligible voters, including those who are not yet registered; communicate with voters; and encourage voters to turn out and vote." (*Id.* ¶ 4.) On March 25, 2025, Plaintiff sent Defendant a letter requesting sixteen categories of voter registration records that it alleges are in Defendant's possession, custody, or control. (*Id.* ¶ 10; *see also* ECF No. 1-1 at 3-6.)[3] Plaintiff requested those records "in electronic format" and "on a rolling basis." (ECF No. 1 ¶ 11; *see also* ECF No. 1-1 at 7.) Defendant did not initially reply to this letter. (ECF No. 1 ¶ 12.) On June 3, 2025, Plaintiff sent a follow-up letter requesting a status update. (*Id.* ¶ 13; *see also* ECF No. 1-2 at 2.)

While awaiting a response from Defendant to the March 25, 2025 requests, Plaintiff sent a letter on June 16, 2025, seeking two additional categories of voter registration records. (ECF No. 1 ¶ 15; *see also* ECF No. 1-4 at 3.) On June 18, 2025, Defendant emailed Plaintiff stating Defendant was reviewing Plaintiff's March 25, 2025 requests. (ECF No. 1 ¶ 14; *see also* ECF No. 1-3 at 2.)

---

[2]    When Plaintiff filed the Complaint on November 17, 2025, the Secretary of State of New Jersey was Tahesha Way. (ECF No. 1 ¶ 1.) On January 20, 2026, Dale G. Caldwell succeeded Secretary Way, (ECF No. 16), and therefore automatically substituted Secretary Way as Defendant in this matter, *see* Fed. R. Civ. P. 25(d).

[3]    Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

On July 3, 2025, Plaintiff sent Defendant a letter asserting that New Jersey was in violation of the NVRA for "fail[ing] to provide the requested records" requested in Plaintiff's March 25, 2025 letter. (ECF No. 1 ¶ 17; ECF No. 1-6 at 2-3.) In particular, Plaintiff asserted that Defendant was in violation of the NVRA's public disclosure provision. (ECF No. 1-6 at 2.) That provision requires "[e]ach state" to

> maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

52 U.S.C. § 20507(i)(1). Plaintiff also asserted that by failing to provide the records, Defendant violated the New Jersey Open Public Records Act (OPRA), N.J. Stat. Ann. §§ 47:1A-1 *et seq.* (ECF No. 1-6 at 2-4.) Plaintiff indicated Defendant could cure these violations by "providing the requested records." (ECF No. 1 ¶ 18; ECF No. 1-6 at 4.)

On July 11, 2025, Defendant emailed Plaintiff in response to Defendant's July 3, 2025 letter. (ECF No. 1 ¶ 19.) Defendant sent a link with documents at least partially responsive to two of Plaintiff's sixteen March 25, 2025 requests and indicated he would provide "additional responses as soon as" he could. (*Id.*; ECF No. 1-7 at 2.)[4] On July 29, 2025, Defendant sent a letter to Plaintiff setting forth his objections and specific responses to each of Plaintiff's March 25 and June 16 requests for records and provided no further documents. (ECF No. 1-8.) This litigation ensued.

---

[4]    The link contained documents in two files: one labeled "Deleted_3.2023_7.2025" and another labeled "Inactive Voters." (ECF No. 1-7 at 2.)

3

### B.      Procedural Background

#### 1.      *State Court OPRA Complaint*

On July 17, 2025, Plaintiff filed a complaint in New Jersey Superior Court, Mercer County, alleging violations of OPRA based on what Plaintiff perceived as an inadequate response to the March 25, 2025 requests.  *See* Verified Complaint, *Republican Nat'l Comm. v. Div. of Elections*, No. MER-L-1499-25 (N.J. Super. Ct. Law Div. July 17, 2025).  The suit alleged that the Division of Elections violated OPRA "by not providing [Plaintiff] with copies of all documents requested by it through" its March 25, 2025 requests.  (ECF No. 17-3 at 2-9.)  The suit also alleged the Division of Elections violated OPRA in connection with a set of requests sent on July 3, 2025. (*Id.*)  The July 3, 2025 requests are not at issue in the instant matter.

On July 30, 2025, the state court dismissed Plaintiff's OPRA complaint without prejudice. (ECF No. 17-4 at 2-3.)  The court reasoned that under OPRA, if the public agency produces the requested records within seven business days of service, the complaint must be dismissed without prejudice.  (*Id.* at 3 (quoting N.J. Stat. Ann. § 47:1A-6).)  The Division of Elections represented that it produced the responsive records that it was required to disclose under OPRA within this seven-day period, so the court dismissed the complaint without prejudice and invited Plaintiff to file a new complaint if Plaintiff wished to challenge the Division of Elections' production or representations.  (*Id.*)

Plaintiff did not file a new complaint, but on August 19, 2025, Plaintiff filed a motion for reconsideration of that dismissal.  (ECF No. 17-5 at 2.)  On December 11, 2025, the court granted the motion with respect to the July 3, 2025 requests but denied it with respect to the March 25, 2025 requests.  (ECF No. 17-6 at 2-12.)  On February 19, 2026, the court dismissed the complaint as to the remaining July 3, 2025 requests with prejudice.  (ECF No. 17-8 at 2-3.)  The court

reasoned that because OPRA does not require a public agency to provide records that do not exist or are not in the public agency's possession, and because the parties agree that the Division of Elections did not maintain the records in the July 3, 2025 requests, Plaintiff failed to allege an OPRA violation. (*Id.* at 10.)

### 2. *District Court NVRA Complaint*

On November 17, 2025—after Plaintiff filed the state court complaint but before the state court dismissed the March 25, 2025 related claims—Plaintiff filed a Complaint in this Court. (ECF No. 1.) Plaintiff brings one claim for violation of the public disclosure provision of the NVRA. (*Id.* ¶¶ 24-29.) Plaintiff asserts Defendant violated this provision by "fail[ing] to provide" the voter registration records to Defendant. (*Id.* ¶¶ 26-28.) This information, Plaintiff alleges, is "essential" for three reasons. (*Id.* ¶ 26.) First, it is essential for Plaintiff to "assess the accuracy of the voter registration data it purchases from New Jersey for the purposes of engaging in voter communications, get-out-the-vote activities, and other political action." (*Id.*) Second, it is essential to Plaintiff's "political efforts to assess whether the State of New Jersey is conducting 'a general program that makes a reasonable effort to remove the names of ineligible voters' from its official voter registration lists." (*Id.* (quoting 52 U.S.C. § 20507(a)(4).) And third, it is essential to Plaintiff's "efforts to ensure election integrity and advocacy for election administration improvements." (*Id.*)

In the instant matter, Plaintiff's claim is limited to request numbers 1, 3-5, 8-10, and 14-16 in the March 25, 2025 letter and does not seek records related to requests made in the June 16, 2025 letter. (*Id.* ¶ 21; ECF No. 23 at 15.) The at-issue requests from March 25, 2025 seek the following:

- Request 1: "Each record setting forth, documenting, describing, or discussing the programs and activities conducted in [New Jersey] for the purpose of ensuring the

5

accuracy and currency of official lists of eligible voters from March 2023 to the time of [Defendant's] response to this request." (ECF No. 1-2 at 4.)

- Request 3: "Each record that lists or identifies persons **sent an address confirmation** in [New Jersey] for voter registration purposes from March 2023 until the date of [Defendant's] response to this request." (*Id.* (emphasis in original).)

- Request 4: "Each record that lists or identifies persons sent an address confirmation who **responded to the notice** from March 2023 until the time of your response to this request." (*Id.* (emphasis in original).)

- Request 5: "Each record that lists or identifies persons sent an address confirmation who did **not** respond to the notice from March 2023 until the time of [Defendant's] response to this request." (*Id.* (emphasis in original).)

- Request 8: "From March 2023 until the time of [Defendant's] response to this request, each record utilizing, documenting or discussing information about **deceased** voters for the purpose of updating voter registrations exchanged between [Defendant's] office and" any office from an enumerated list of government offices. (*Id.* at 5 (emphasis in original).)[5]

- Request 9: "From March 2023 until the time of your response to this request, each record utilizing, documenting or discussing information about **relocated** (i.e., change of residence) voters for the purpose of updating voter registrations exchanged between your office and" any office from an enumerated list of government offices. (*Id.* (emphasis in original).)

- Request 10: "From March 2023 until the time of [Defendant's] response to this request, each record utilizing, documenting or discussing information about voters **convicted of a crime** for the purpose of updating voter registrations exchanged between your office and" any office from an enumerated list of government offices. (*Id.* (emphasis in original).)

- Request 14: "Each record exchanged between [Defendant's] office and **other state officials or state agencies** discussing or identifying deceased, relocated, criminally convicted, duplicate-registered, non-voting, or non-citizen voters for the purpose of updating your state's voter registration list from March 2023 until the time of your response to this request." (*Id.* at 6-7 (emphasis in original).)

---

[5] These offices are the: State Department of Health; State Department of Corrections; State Department of Motor Vehicles; State Judiciary (including court clerks); U.S. Social Security Administration; U.S. Postal Service; U.S. Citizenship & Immigration Service; U.S. Department of Homeland Security (or any agency of the Department); U.S. Judiciary System (including court clerks); and U.S. Department of Justice (or any agency of the Department). (ECF No. 1-2 at 5.) These are the same offices with respect to Requests 9 and 10. (*See id.* at 5-6.)

- Request 15: "From March 2023 until the time of [Defendant's] response to this request, each record exchanged between your office and a **county/city/town** voter registration official transmitting or discussing" any topic from a list of enumerated topics. (*Id.* at 7 (emphasis in original).)[6]

- Request 16: "Each record that is or mentions a complaint, message, report, study, notice, email, or other communication (electronic form or paper form) [Defendant's] office has received discussing **voter roll inaccuracies**, and each record documenting [Defendant's] **corrective action or response** to each complaint, message, report, notice, email, or other communication." (*Id.* (emphasis in original).)

Plaintiff seeks a declaration that Defendant's "refusal to provide" records in response to these March 25, 2025 requests violates the public inspection provision of the NVRA; a declaration that any state law that prohibits Defendant "from providing the requested" records is preempted by federal law; an order requiring Defendant to "provide to the RNC all records reflecting, listing, or otherwise concerning individuals removed from New Jersey's voter registration list from March 25, 2023, through the date of the Court's order"; reasonable attorneys' fees; and further relief that the Court deems just and proper. (ECF No. 1 at 10-11.) On February 20, 2026, Defendant filed the instant Motion to Dismiss on the grounds that (1) Plaintiff lacks standing, (2) its claims are

---

[6]     These topics are: "Instructions to the county/city/town concerning their voter list maintenance practices and responsibilities"; "Instructions to the county/city/town for the identification and removal of noncitizens"; "Instructions to the county/city/town for the identification and removal of deceased voters"; "Instructions to the county/city/town for the identification and removal of voters who changed residences"; "Instructions to the county/city/town for the identification and removal of convicted felons"; "Instructions to the county/city/town for the identification and removal of voters who are registered to vote in more than one jurisdiction"; "Instructions to the county/city/town for the identification and removal of voters who have not voted in successive elections"; "Notices to the county/city/town concerning any failure to comply with its voter list maintenance obligations under [New Jersey's] program or law"; and "Records from a county/city/town reporting on the locality's implementation of a program to identify and remove from the voter registration list those voters who are ineligible, deceased, relocated, felons, registered in more than one location, or noncitizens." (ECF No. 1-2 at 7.)

precluded by New Jersey's entire controversy doctrine, and (3) Plaintiff fails to state a claim. (ECF No. 17.) Defendant's Motion is now ripe for review.

## II.    LEGAL STANDARD

Rule 12(b)(1) permits a defendant to move at any time to dismiss the complaint for lack of subject matter jurisdiction on either facial or factual grounds. *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000). A facial challenge asserts that "the complaint, on its face, does not allege sufficient grounds to establish subject matter jurisdiction." *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 438 (D.N.J. 1999). In analyzing a facial challenge, a court "must only consider the allegations of the complaint and documents attached thereto, in the light most favorable to the plaintiff." *Gould Elecs. Inc.*, 220 F.3d at 176. "A court considering a facial challenge construes the allegations in the complaint as true and determines whether subject matter jurisdiction exists." *Arosa Solar Energy Sys., Inc. v. Solar*, Civ. No. 18-1340, 2021 WL 1196405, at *2 (D.N.J. Mar. 30, 2021).

A factual challenge, on the other hand, "attacks allegations underlying the assertion of jurisdiction in the complaint, and it allows the defendant to present competing facts." *Hartig Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016). The "trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case" and "the plaintiff will have the burden of proof that jurisdiction does in fact exist." *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). "Therefore, a 12(b)(1) factual challenge strips the plaintiff of the protections and factual deference provided under 12(b)(6) review." *Hartig Drug Co.*, 836 F.3d at 268. Regardless of the type of challenge, the plaintiff bears the "burden of proving that the court has subject matter jurisdiction." *Cottrell v. Heritages Dairy Stores, Inc.*, Civ. No. 09-1743, 2010

8

WL 3908567, at *2 (D.N.J. Sep. 30, 2010) (citing *Mortensen*, 549 F.2d at 891).[7]

## III.    **DISCUSSION**

Although Defendant asserts three grounds for dismissal, the Court will only address the first argument because it agrees that Plaintiff has failed to allege standing. *See Adam v. Barone*, 41 F.4th 230, 233 (3d Cir. 2022) ("[I]f a plaintiff does not have standing, courts 'lack authority under Article III of the Constitution to consider the merits' of any claim." (*quoting In re Boy Scouts of Am.*, 35 F.4th 149, 156 (3d Cir. 2022)).

Defendant argues Plaintiff lacks standing because it fails to plead a sufficient informational injury. (ECF No. 17-1 at 18-22.) Plaintiff responds that it has pled an informational injury sufficient to confer Article III standing. (ECF No. 23 at 16-24.)

To establish Article III standing, a plaintiff must allege: "(1) an injury-in-fact; (2) that is fairly traceable to the defendant's challenged conduct; and (3) that is likely to be redressed by a favorable judicial decision." *Kelly v. RealPage Inc.*, 47 F.4th 202, 211 (3d Cir. 2022) (quoting *St. Pierre v. Retrieval-Masters Creditors Bureau, Inc.*, 898 F.3d 351, 356 (3d Cir. 2018)). The parties dispute whether Plaintiff has pled the first requirement of an injury-in-fact. (*See* ECF No. 17-1 at 18-22; ECF No. 23 at 16-24.)

"An injury in fact exists if a plaintiff has suffered 'an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'" *Pub. Int. Legal Found. (PILF) v. Sec'y Commonwealth of Pa.*, 136 F.4th 456, 461 (3d Cir. 2025) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). A plaintiff asserting an informational injury from a violation of a statute—when that statute is aimed at more than just

---

[7]    The Court does not include the standard for evaluating a motion to dismiss under Rule 12(b)(6) as it does not reach this issue due to Plaintiff's lack of standing.

disclosure of information—pleads a "sufficiently concrete" injury when the plaintiff alleges "(1) the denial of information and (2) some consequence caused by that omission." *Id.* at 464, 465 n.4 (emphasis omitted) (quoting *Kelly*, 136 F.4th at 213).[8]  And that consequence must have "a nexus to the interest Congress sought to protect." *Id.* at 464 (emphasis omitted) (quoting *Kelly*, 136 F.4th at 214).  In other words, "it is insufficient for Article III standing purposes for a plaintiff asserting an informational injury from a violation of a statute that contains a public disclosure aspect as part of its overall scheme to allege only that [the plaintiff] has been denied information." *Id.* at 465. Rather, a plaintiff "must establish *a nexus* among the omitted information to which she has entitlement, the purported harm *actually caused* by the specific violation, and *the 'concrete interest'* that Congress identified as 'deserving of protection' when it created the disclosure requirement." *Id.* at 464. (emphasis in original) (quoting *Kelly*, 136 F.4th at 213).  "Without such a nexus, a plaintiff can claim no informational injury standing." *Id.* at 465.

But it is insufficient to merely assert a consequence with such a nexus.  A plaintiff must also allege "*concrete plans* to imminently pursue a desired course of action' bearing a nexus to an interest Congress sought to protect that was hindered only by the [defendant's] refusal to turnover the records." *Id.* at 468 (emphasis added) (quoting *Ellison v. Am. Bd. of Orthopaedic Surgery*, 11 F.4th 200, 207 n.5 (3d Cir. 2021)).  Otherwise, the plaintiff will have only asserted "'inchoate plans for future programs of a general nature' [which] are insufficiently concrete for Article III purposes." *Id.* at 468-69 (quoting *Fair Hous. Council of Suburban Phila. v. Montgomery Newspapers*, 141 F.3d 71, 77 (3d Cir. 1998)).

---

[8]     When the asserted informational injury stems from a violation of a "sunshine law"—a "statut[e] aimed solely at disclosure of information"—a denial of information is all that is needed to establish Article III standing.  *PILF v. Sec'y Commonwealth of Pa.*, 136 F.4th 456, 465 n.4 (3d Cir. 2025) (citing *TransUnion v. Ramirez*, 594 U.S. 413, 441-42 (2021)).

In *PILF*, the Third Circuit found the plaintiff lacked standing to compel disclosure of voter information under the NVRA as it had not suffered any concrete harm.  There, the plaintiff was an Indiana-based "self-described 'public interest organization that seeks to promote the integrity of elections nationwide.'"  *Id.* at 459.  The plaintiff requested records from the Secretary of the Commonwealth of Pennsylvania, and after the Secretary rejected those requests, the plaintiff sued the Secretary for the alleged violation of the NVRA's public disclosure provision and argued it suffered an informational injury.  *Id.* at 459-60.  The district court found the plaintiff had standing, but the Third Circuit reversed based on an analysis of the NVRA's purpose and the interest the Plaintiff claimed was harmed by the Secretary's actions.  *Id.* at 466-470.

As for purpose, the Third Circuit stated that "Congress enacted the NVRA principally because it 'was wary of the devastating impact [voter roll] purging efforts previously had on the electorate.'"  *Id.* at 466 (alteration in original) (quoting *Am. C.R. Union v. Phila. City Comm'rs*, 872 F.3d 175, 178 (3d Cir. 2017)).  The Third Circuit surveyed its previous opinions analyzing the NVRA's legislative history, with each opinion documenting that the key purpose of the NVRA was to increase voter participation against the backdrop of historical disenfranchisement efforts.  *See id.* (first citing *Welker v. Clarke*, 239 F.3d 596, 598-99 (3d Cir. 2001); then citing *Ortiz v. Phila. Off. of City Comm'rs Voter Regis. Div.*, 28 F.3d 306, 318 (3d Cir. 1994) (Scirica, J., concurring); and then citing *Am. C.R. Union*, 872 F.3d at 178.)  The Third Circuit also looked to the text of the NVRA which, by its own terms, seeks:

> (1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;
>
> (2) to make it possible for Federal, State, and local governments to implement this chapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;
>
> (3) to protect the integrity of the electoral process; and

11

(4) to ensure that accurate and current voter registration rolls are maintained.

*Id.* at 467 (quoting 52 U.S.C. § 20501(b)).  The court therefore concluded that "the statute aims at increasing citizen participation in federal elections."  *Id.*

The Third Circuit then analyzed the plaintiff's proffered downstream consequences to determine whether there was a sufficient nexus to the NVRA's purpose such that the plaintiff demonstrated a concrete informational injury for Article III standing.  *Id.*  The court rejected each of the plaintiff's three proffered adverse consequences.  First, the plaintiff argued that without the records, it could not "study and analyze the [Secretary's] voter list maintenance activities" which would hamper the plaintiff's ability to "promote election integrity and compliance with federal and state statutes."  *Id.*  The court rejected this downstream consequence because the inability to "study and analyze" the records in order to promote election integrity was not an activity "essential to a concrete interest protected by" NVRA.  *Id.*  In particular, the court reasoned that "[t]o 'study and analyze' records . . . is not an enumerated purpose of the NVRA nor do these aims advance the expansion of voter registration and participation in federal elections."  *Id.*  And the plaintiff offered "no explanation of how its inability to study and analyze and scrutinize the requested records has hindered its own participation in the electoral system or the expansion of voter participation in federal elections in Pennsylvania generally."  *Id.*  Finally, the plaintiff had "no ties to Pennsylvania or any of its voters," which were facts that "undercut[] its position that the Secretary's actions as to [the plaintiff] resulted in any harm to those who Congress sought to protect in enacting the NVRA."  *Id.*  The court noted that "private citizens are not deputized as private attorneys general empowered to enforce any and all violations of a statute without regard to their personal stake in the matter."  *Id.*  at 468.

Second, the plaintiff argued that the defendant's actions frustrated the plaintiff's ability to "produc[e] and disseminat[e] . . . educational materials." *Id.* The court rejected this alleged consequence because "the publication of educational materials bears no nexus to an interest protected by the statute." *Id.* The Third Circuit reasoned that "facilitation and creation of educational materials is not a purpose of the NVRA," and even if there were a nexus, the plaintiff "offered no proof that its ability to produce and disseminate such educational materials was actually hampered by the Commonwealth's alleged violation of the NVRA." *Id.*

Third, the plaintiff argued the "considerable time and financial resources" it spent seeking the records should confer standing. *Id.* The court summarily rejected this argument because "[a]n organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information." *Id.* at 468 (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024)). Accordingly, the court remanded with instructions to dismiss the case for lack of Article III standing. *Id.* at 470.

The only two decisions in this Circuit that have applied *PILF* to NVRA claims have similarly found no informational injury sufficient to confer Article III standing. In *1789 Foundation, Inc. v. Schmidt*, the Middle District of Pennsylvania granted the defendant's motion to dismiss for lack of standing. 781 F. Supp. 3d 282, 320 (M.D. Pa. 2025). There, the plaintiff was a nonprofit organization organized under the laws of Florida with a mission to educate "American[s] about their right and advocat[e], protect[], and preserv[e] American civil liberties and constitutional rights[.]" *Id.* at 290. The plaintiff sought records related to Pennsylvania's compliance with a provision of the NVRA that requires inactive voters to be removed from State voters rolls. *Id.* at 295. Dissatisfied with the defendant's response, the plaintiff brought suit under the same public disclosure provision of the NVRA. *Id.* at 299. It alleged that the inability to

review the records "frustrates its purpose of preserving constitutional rights and civil liberties[.]" *Id.* at 300. The plaintiff also "expended substantial resources, including staff time, investigating [the defendant's] failure to comply with their NVRA voter list maintenance obligations[.]" *Id.* at 301. The court found that, under *PILF*, the plaintiff failed "to plausibly allege any adverse or concrete downstream consequences purportedly stemming from the alleged denial of its records request" and failed to "allege a 'nexus among a downstream consequence, [its] alleged harm, and the interest Congress sought to protect.'" *Id.* at 320 (quoting *PILF*, 136 F.4th at 465.)

Similarly, in *Voter Reference Foundation, LLC v. Schmidt*, another case from the Middle District of Pennsylvania, the court found the plaintiff failed to establish an informational injury sufficient to confer Article III standing. Civ. No. 24-294, 2026 WL 1103572, at *9 (M.D. Pa. Apr. 23, 2026), *appeal docketed*, No. 26-2280 (3d Cir. May 26, 2026). There, a non-profit organized under Ohio law was denied requested voter data and brought suit under the NVRA. *Id.* at *1. The plaintiff alleged a variety of harms. First, the plaintiff alleged "the denial impeded on its plans 'to analyze the records, information and data provided in response to the [] request in order to engage in a discrepancy review of the Pennsylvania voter rolls.'" *Id.* at *9. The court found this harm insufficient because, under *PILF*, "studying, analyzing, and scrutinizing records 'is not an enumerated purpose of the NVRA . . . [and] . . . these aims [do not] advance the expansion of voter registration and participation in federal elections.'" *Id.* (alterations in original) (quoting *PILF*, 136 F.4th at 467.) Second, the plaintiff contended that "the denial frustrated its intention to 'post this data for the public to access and view free of charge so that the public can fulfill its oversight duties under the NVRA'" and "remain informed." *Id.* The court dismissed this harm, because, under *PILF*, "'the facilitation and creation of educational materials is not a purpose of the NVRA' and 'bears no nexus to an interest protected by the statute.'" *Id.* (quoting *PILF*, 136 F.4th at 467.)

14

Finally, the plaintiff asserted that the denial "hinders confidence in the integrity of the electoral system," but the court rejected this rational because it was "neither concrete nor particularized" and instead was "wholly speculative." *Id.* (citing *Lujan*, 504 U.S. at 560.)

Here, Plaintiff seeks disclosure of voter information under the same public disclosure provision of the NVRA. (ECF No. 1 ¶ 1 (citing 52 U.S.C. § 20507(i).) And it claims it has suffered an informational injury sufficient to confer Article III standing. (ECF No. 23 at 17-24.)

Plaintiff alleges that the information it requests is "essential" and furthers the goals of the NVRA. (ECF No. 1 ¶ 26; ECF No. 23 at 17-20.) First, Plaintiff alleges that the information is essential for Plaintiff "to assess the accuracy of the voter registration data it purchases from New Jersey for the purpose of engaging in voter communications, get-out-the-vote activities, and other political action." (ECF No. 1 ¶ 26.) Second, Plaintiff alleges the information is essential to ensure Plaintiff can assess whether New Jersey is complying with the NVRA and "ensure election integrity and advocacy for election administration improvements." (*Id.* (citing 52 U.S.C. § 20507(a)(4)).) The Court will infer that the inability to do each of these "essential" activities constitutes the "downstream consequences" that will occur due to Defendant's denial of the records.

The remaining question therefore is whether Plaintiff has pled a nexus between these consequences and Congress's interest in increasing voter participation in federal elections. Plaintiff's allegations are nearly identical to the harms the court rejected in *PILF*. *Compare PILF*, 136 F.4th at 467 (finding "insufficient nexus among the downstream consequences identified by [the plaintiff] and the interest that Congress sought to protect" when the plaintiff asserted that without the voter records it could not "'study and analyze the [defendant's] voter list maintenance activities,' [which] hampers its 'activity . . . to promote election integrity and compliance with

15

federal and state statutes.'"); *with* (ECF No. 1 ¶ 26 ("This information is essential for [Plaintiff] to assess the accuracy of the voter registration data it purchases from New Jersey[.]")), *and* (*id.* ("[T]he information is . . . essential to assess whether the State of New Jersey is [complying with 52 U.S.C.] § 20507(a)(4)")), *and* (*id.* ("[T]he information is . . . essential to [plaintiff's] efforts to ensure election integrity[.]")).    Accordingly, and as more fully explained below, Plaintiff's allegations are insufficient to confer standing.

First, Plaintiff's need to "assess" the accuracy of voter information, (ECF No. 1 ¶ 26), was expressly rejected by the Third Circuit in *PILF*, *see PILF*, 136 F.4th at 467 ("To 'study and analyze' and 'scrutinize' records is not an enumerated purpose of the NVRA nor do these aims advance the expansion of voter registration and participation in federal elections." (citation omitted)).    In particular, without the records, Plaintiff alleges that it cannot engage in "voter communications, get-out-the-vote activities, and other political action."    (ECF No. 1 ¶ 26.) Allegations of engaging in "voter communications" and "other political action" are too vague to establish the requisite nexus because Plaintiff does not plead concrete plans for these activities nor does it plead that it intends to engage in those communications or those actions to *increase* voter participation in federal elections.    *PILF*, 136 F.4th at 466 ("Congress . . . *sought to increase voter participation* . . . by passing the NVRA." (emphasis in original) (citation modified)).

However, engaging in "get-out-the-vote activities" could "bear[] a nexus" to Congress's interest in increasing voter participation. *See PILF*, 136 F.4th at 468 (citing approvingly *Campaign Legal Center v. Scott*, 49 F.4th 931, 940 (5th Cir. 2022) (Ho, J. concurring), for the notion that hindrance of a plaintiff's "mission to protect the voting rights of various communities might suffice as a downstream consequence under the NVRA" (citation modified)).    And while, unlike in *PILF*, Plaintiff asserts "ties to [New Jersey] . . . voters," the Court ultimately finds the lone reference to

16

"get-out-the-vote-activities" insufficient because a plaintiff must plead "concrete plans to imminently pursue a desired course of action." *Id.* at 467-68 (quoting *Ellison*, 11 F.4th at 207 n.5). "'[I]nchoate plans for future programs' of a general nature are insufficiently concrete for Article III purposes." *Id.* at 468-69 (quoting *Fair Hous.*, 141 F.3d at 77); *see also Voter Reference Found.*, 2026 WL 1103572, at *9 (rejecting asserted downstream consequence when it was "neither concrete nor particularized" and instead was "wholly speculative"); *1789 Found.*, 781 F. Supp. 3d at 320 (dismissing complaint for failure to allege concrete downstream consequence); *c.f. Republican Nat'l Comm. v. Benson*, Civ. No. 24-1985, 2025 WL 2731704, at *2 (6th Cir. Sep. 25, 2025) (ruling RNC failed to allege organizational standing when it did not "plead specific, certainly impending injuries" (emphasis omitted)); *Republican Nat'l Comm. v. Aguilar*, Civ. No. 24-00518, 2024 WL 4529358, at *7 (D. Nev. Oct. 18, 2024) (ruling RNC failed to plead organizational standing when it did "not provide any evidence or examples of *how* voter lists have actually impaired RNC's ability to get voters to register and vote or elect candidates" (emphasis in original)). Here, Plaintiff not only fails to allege concrete plans for how it intends to use the specific records in this case, but it also fails to allege how Defendant's failure to provide those records impairs its ability to increase voter participation, so it has not satisfied its burden of alleging the informational injury needed to confer Article III standing.

Plaintiff's remaining allegations—ensuring compliance with the NVRA and election integrity (ECF No. 1 ¶ 26)—were squarely rejected by the Third Circuit. *See PILF*, 136 F.4th at 467 (finding inability "to promote election integrity and compliance with federal and state statutes" insufficient to confer standing); *id.* at 468 ("[P]rivate citizens are not deputized as private attorneys general empowered to enforce any and all violations of a statute without regard to their personal

17

stake in the matter."). The Court will accordingly grant Defendant's Motion without prejudice and refrain from considering its remaining arguments. *See Adam*, 41 F.4th at 233.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, and other good cause shown, Defendants' Motion to Dismiss (ECF No. 17) is **GRANTED**. An appropriate Order follows.

Dated: July 20 , 2026

**GEORGETTE CASTNER**
**UNITED STATES DISTRICT JUDGE**